STEPHANIE SHERIDAN (State Bar No.135910)
stephanie.sheridan@sedgwicklaw.com
VICTORIA PAAL (State Bar No. 260396)
victoria.paal@sedgwicklaw.com
SEDGWICK LLP
333 Bush Street, 30th Floor
San Francisco, CA 94104
Telephone: 415.781.7900
Facsimile: 415.781.2635

Attorneys for Defendant
FEDEX OFFICE AND PRINT SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAZMIG TCHOBOIAN and ANGELA POTIKYAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FEDEX OFFICE AND PRINT SERVICES, INC. (f/k/a FEDEX KINKOS OFFICE AND PRINT SERVICES, INC.); DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: SACV10-01008-JAK-(MLGx)<br><br>**FIRST AMENDED DECLARATION OF EVAN HENDRICKS IN SUPPORT OF FEDEX OFFICE AND PRINT SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. John A. Kronstadt<br>Date: November 7, 2011<br>Time: 1:30 p.m.<br>Ctrm.: 750 – 7th Floor |

-1-

I, Evan Hendricks, hereby declare and state:

1. I am familiar with and have personal knowledge of the matters set forth in this declaration and if called upon to do so, could and would testify competently thereto, except where my knowledge is based upon information and belief, and as to those matters, I understand and believe them to be true.

## QUALIFICATIONS & BACKGROUND

2. I make this declaration as an expert in the field of sensitive personal information, including credit card numbers, as it relates to data breaches, data security, identity theft and principles of Fair Information Practices.

3. Since 1977, information-privacy issues, and the Federal and State laws and policies governing them, have been an integral part of my professional life as an editor and publisher of a specialized newsletter, and for the past decade as an expert witness appearing before courts and Congress, and as an expert consultant to governmental, corporate and non-profit organizations. I was one of the first experts to publish about identity theft when it first surfaced in the 1990s. I was also one of the first experts to publish about data breaches following enactment of the first State law pertaining to them in California, as well as state laws mandating truncation of credit card numbers.

4. My expertise in sensitive personal information, data breaches, data security, and identity theft stems from several of my professional activities, including: (1) Editor/Publisher of a specialty news reporting service that covers credit reporting; (2) author of the book *Credit Scores and Credit Reports: How The System Really Works, What You Can Do* (3rd Ed., Privacy Times 2007), and co-author of a book on information-privacy; (3) an expert witness qualified by the federal courts in litigation involving personal data; (4) an expert who has testified before Congress on numerous occasions, and who has testified twice before the California legislature in regard to legislation on the use of financial data; (5) an expert consultant to government agencies and private corporations; and (6) a

member of the Consumer Advisory Council of Experian, one of the three national Credit Reporting Agencies (CRAs).

5. Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act. The newsletter ranges from 8-12 pages, 23 issues per year. This means that in this newsletter (and its three-year predecessor), I have researched, written, edited and published an estimated 2,000 pages relating to information law, policy and organizational practice, including Congressional and State legislative actions, judicial opinions, technology developments, industry trends and actions, executive branch policies and consumer news. These endeavors have allowed me to accumulate a specialized body of knowledge in relation to the collection, use and disclosure of credit report data and personal financial information, and the standards governing them. *Privacy Times* is a subscription-only newsletter. The readers are generally the attorneys and specialists within government agencies, corporations, law firms, universities and public interest groups that are responsible for issues relating to freedom of information and privacy laws, including the FCRA and similar State statutes.

6. I am author of the book, *Credit Scores and Credit Reports: How The System Really Works, What You Can Do, 3rd Ed.* (Privacy Times 2007). The book has 23 chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of *Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society* (2nd Ed., Southern Illinois University Press, 1990), which has a chapter on credit reporting. I was also a contributor to *Fair Credit Reporting, 6th Ed.* (National Consumer Law Center, 2006), the leading manual for FCRA practitioners.

///

7. Since the early 1990s, I have served as an expert witness in numerous cases involving alleged misuse and/or mismanagement of personal data and have been qualified by the federal courts.[1] As an expert witness, I have had the opportunity to read thousands of pages of often confidential deposition testimony in which officials describe their organizations' practices and procedures for handling sensitive personal information. This is significant because many of these organizations do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, some typically consider such procedures and practices to be proprietary and/or confidential.

8. I have testified before Congress on numerous occasions, including several hearings focused on breaches of consumers' sensitive personal data. I was intimately involved in the work, discussions and negotiations leading up to the 2003 FACT Act Amendments, including the provisions mandating truncation of credit card numbers. This included communicating and working with officials from the credit card industry. A true and correct copy of my *Curriculum Vitae* is attached hereto as **Exhibit 1.**

9. From 2002 – 2004, I served on the Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. The Council met twice a year to advise the company on a host of credit reporting, marketing and other privacy-related topics. Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues. In 2002, the U.S. Postal Service retained me under contract to review its re-writing of its Privacy Act notices to ensure they were understandable to the public and consistent with the

---

[1] See, for example, *Adelaide Andrews v. TRW, Inc.*, 225 F.3d 1063 (9th Cir. 1990). Although the trial judge qualified me, the Ninth Circuit, in reversing part of her opinion in favor of defendant, ruled that she overly limited the scope of my testimony as to the prevalence of identity theft and its impact on credit report accuracy and integrity. "In making that determination the jury would be helped by expert opinion on the prevalence of identity theft, as the district court would have been helped if it had given consideration to the Plaintiff's witnesses on this point before giving summary judgment," the Ninth Circuit panel wrote.

1  Privacy Act's goals of ensuring FIPs. In 1990, Equifax, another national CRA,
2  published "The Equifax Report on Consumers In the Information Age,"
3  a nationwide opinion survey and analysis by Louis Harris and Associates and
4  Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors
5  expressed appreciation for my advice on survey coverage.
6      10.    Since 2005, I have served at times as a consultant to ID Watchdog,
7  a company offering identity theft, monitoring, protection and resolution services.

## THE SIGNIFICANCE OF CREDIT CARD DIGITS

9      11.    The number that appears on the face of a payment card issued by a
10 U.S. financial institution is governed by an international standard that allows
11 financial institutions, merchants, cardholders and payment networks throughout the
12 world to interoperate and exchange information in a seamless fashion.
13 The standard was developed by the International Organization for Standardization
14 (ISO) and the International Electrotechnical Commission (IEC). The current
15 version, called ISO ISO/IEC 7812-1:2006, was published in 2006.
16     12.    A payment card number used by a financial institution in the U.S.
17 typically consists of 16 digits. The first digit is reserved in the international
18 standard to identify the major industry of the issuer, but in practice this first digit
19 has come to identify the brand of the card. American Express cards begin with 3;
20 Visa cards begin with 4; MasterCard cards begin with 5 and Discover cards begin
21 with 6. The correlation between card brands and the first digit is widely known to
22 the public, and in particularly to potential fraudsters. The first six digits, including
23 the first number, are the Bank Identification Number (BIN). This BIN identifies
24 the financial institution that issued the card. These numbers are not published by
25 the payment networks or the financial institutions. Many of these BINS, however,
26 are known to stakeholders in the industry including retailers and processors and are
27 available from time to time on Websites. For instance, the online encyclopedia
28 ///

13. Wikipedia lists various BIN numbers, and I can attest to the accuracy of many of those listed.

14. The numbers 7 through 15 are reserved for an account number specific to the individual who receives the card. The final number is a function of the previous numbers and serves as a check that the number is a valid card number.

15. The check system works as follows: in a 16 digit account number, double every odd numbered digit (the first, third, fifth, etc.); if the result exceeds 9, subtract nine from this result (this guarantees that each result is 9 or less); then add up all these digits, the doubled digits as well as the others. If this sum is divisible by 10, then the card number is valid.

For instance, let's examine the following number to see if it is a valid card number:

4388 1234 5678 9876

First, double all the odd numbered digits. This produces:

8 3 16 8 2 2 6 4 10 6 14 8 18 8 14 6

Then go through this number and subtract 9 from every number greater than 9:

8378 2264 1658 9856

This number sums to 88 which is not divisible by 10. So the number is not a valid payment card number. After the fact, this formula serves to check the validity of a number. From the issuer point of view, however, the final digit is something to choose to make sure the number is valid.

16. Industry officials explained these basic facts about the payment card numbering system, as set forth in paragraphs 11 to 13 above, to key Congressional staff in the course of legislative consideration of the FACT Act in 2003. The brand of the card is associated with the first digit of the 16 digit account number. Like the first digit, the second digit is part of the Bank Identification Number (BIN). Thus, printing the first two digits on the cardholder's receipt does

-6-

DECLARATION OF EVAN HENDRICKS IN SUPPORT OF FEDEX OFFICE AND PRINT SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

not add any new information for someone who picks up the receipt and is looking to use the information on the card to commit payment card fraud. There are approximately 650 Visa BINs. The first two digits range from 40 to 49. There are approximately 605 MasterCard BINs. The first two digits range from 50 to 58, 60, and 62 to 63. This quantity of digits allows for a vast number of variations among the six digit BINs.

17. Industry practices and rules ensure that the card brand name is printed on the cardholder's receipt. For instance, the summary of Visa's rules for merchants clearly states: "The payment brand used to complete the transaction must be identified on the cardholder's copy of the transaction receipt." The reason for this is to remind the cardholder which brand of card he used for a particular transaction.

18. Most importantly, these first two digits cannot be used to identify or create a valid credit card number that could be used for fraudulent purposes.

19. The FACT Act does not prohibit this industry practice of printing the brand name or the first two digits of the BIN on the cardholder receipt. Nothing in the testimony, the legislative history or, to my knowledge any other aspect of the Congressional discussion of the purpose of the legislation, suggests that Congress was concerned about the presence of brand names or the first two digits of the BIN on the cardholder receipt.

## IDENTITY THEFT RISK

20. In the late 1990s, state legislatures became concerned about the risk to cardholders from the industry practice of printing the entire cardholder number on the cardholder receipt. "Dumpster divers" could recover a cardholder receipt and could potentially use the cardholder number printed on the receipt to commit fraud. Security professionals regularly warned the public to shred their card receipts to reduce this risk.

///

21. The presence of the first two digits on the cardholder's receipt in addition to the last four digits does not increase the risk that a fraudster could guess the entire card number. It is widely known in the industry and certainly among potential fraudsters that the first two digits and the last four digits were not sufficient to commit credit card fraud. Printing the first two digits of the account number on the receipt would add no new information that would increase the fraudster's ability to guess the entire number.

22. Cardholders are especially worried about the risks of counterfeit fraud, where someone makes a card using the cardholder's account number and makes a large number of transactions in retail stores that are then attributed to the cardholder who did not make these transactions. Payment system fraud detection technology can catch these unauthorized transactions quickly, and federal law and industry practice limit the liability of cardholders for these unauthorized transactions. Nevertheless, they remain a special concern to cardholders.

23. The presence of the first two digits on the cardholder's receipt does not increase the risk of counterfeit fraud. Payment systems have evolved layers of security to control this risk of counterfeit fraud.

24. In the Visa system, a payment card transaction involves an authorization message sent from the merchant where the card is being used to the financial institution that provides processing services for the merchant. The message is routed through the Visa communications and computer systems to the bank that issued the card to the customer. The issuing bank authenticates the card information submitted in the message and authorizes the transaction after ascertaining that the cardholder has sufficient funds or credit. A crucial part of this authentication process is the credit card authentication code embedded on its magnetic stripe. This code is called the card verification value (CVV1) and it is not visible on the card itself. The CVV1 is electronically checked during the authorization process for card-present sales to ensure that a valid card is present.

When a credit card is swiped at a point-of-sale terminal, the account number, expiration date, and this code are sent through the Visa network to the issuing bank. The account number functions as routing information, instructing the Visa system to send the information to the appropriate bank and instructing the bank to examine the appropriate account. The CVV1 acts as an access code. It says to the bank that access to this account is authorized. If this code is missing or is not the right code, the issuing bank is alerted that this is a problematic transaction and can decline it. For security purposes, merchants are prohibited from storing this number.

25. There are other ways for a merchant to ask a bank to authorize a transaction. Internet merchants or merchants who provide goods and services via mail order or telephone order do not send the CVV1 code through the Visa system for authorization. An extra layer of security is provided for these "card not present" merchants or transactions through the use of the CVV2 code. This is a unique three-digit code printed on the signature strip on the back of all Visa cards. It is different from the CVV1 code embedded in the magnetic stripe of the card. This code helps merchants confirm that cardholders are in possession of the actual card. Online merchants or telephone merchants conducting transactions when the card is not present can verify that their customers have the actual card by requesting the customer to provide the CVV2 number.

26. Some merchants still use manual imprint machines to process transactions. But almost all face-to-face (brick-and-mortar) merchants use electronic point-of-sale terminals. For transactions at these terminals to be processed, the CVV1 code is needed, because only that code indicates to the issuing bank that a valid card has been presented.

27. Without the CVV1 code, it is not possible to make an effective counterfeit credit card that works for face-to-face card-present transactions. If this code is obtained along with account number and expiration date, an effective

-9-

counterfeit card can be made, but without this code, effective counterfeit cards cannot be created. It is for this reason that the industry data security standard, the Payment Card Industry Data Security Standard, prohibits the storage of these codes.

## CONCLUSION

28. The presence of the first two digits on the cardholder's receipt does not increase the risk that a counterfeit card could be made. This risk relates to the presence of the entire card number and the embedded CVV1 security code. The presence of the first two and last four digits on the cardholder's receipt provides no information about the value of this additional required code nor the card number as a whole. Put simply, the first two digits and final four digits cannot be used to identify or create a valid credit card number that could be used for fraudulent purposes.

29. In enacting the FACT Act, as demonstrated by the legislative history and plain language of the statute itself, Congress was concerned about preventing criminals' easy access to key information that could be used to commit identity theft or fraud. Accordingly, it prohibited the inclusion on receipts of *six or more of the last digits* of a credit card, as those constituted the "key information" that could be used for identity theft or fraud. Because of input from the credit card

///
///
///
///
///
///
///
///
///

industry, and because of the absence of objection from consumer advocates and privacy experts, Congress knew that some credit card digits posed no threat and could continue to appear on receipts.

29. Printing the first two digits and final four digits does not contravene the spirit of the FACT Act's mandates regarding truncation of credit card numbers. Because Defendant's printing of the first two and last four digits cannot be used to identify or create a valid credit card number that could be used for fraudulent purposes, its actions at issue in this case complied with the FCRA and were consistent with the goals and language of the FACT Act Amendments.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 18th day of October 2011, at Bethesda, Maryland.

*[signature]*

Evan D. Hendricks
P.O. Box 302
Cabin John, MD  20818
(301) 229-7002

-11-
DECLARATION OF EVAN HENDRICKS IN SUPPORT OF FEDEX OFFICE AND PRINT SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT