1   STEPHANIE SHERIDAN  (State Bar No.135910)
    stephanie.sheridan@sedgwicklaw.com
2   VICTORIA PAAL        (State Bar No. 260396)
    victoria.paal@sedgwicklaw.com
3   SEDGWICK LLP
    333 Bush Street, 30th Floor
4   San Francisco, CA  94104
    Telephone:  415.781.7900
5   Facsimile:   415.781.2635
6
7   Attorneys for Defendant
    FEDEX OFFICE AND PRINT SERVICES, INC.
8

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13  RAZMIG TCHOBOIAN and          Case No.:  SACV10-01008-JAK-
    ANGELA POTIKYAN, on behalf    (MLGx)
14  of themselves and all others
    similarly situated,
15                                **DECLARATION OF MARK
                    Plaintiffs,   RUDZINSKI**
16
17              v.
18  FEDEX OFFICE AND PRINT        Judge:    Hon. John A. Kronstadt
    SERVICES, INC. (f/k/a FEDEX   Date:     February 13, 2012
19  KINKOS OFFICE AND PRINT       Time:     8:30 a.m.
    SERVICES, INC.); DOES 1 through  Ctrm.:  750—7th Floor
20  10, inclusive,
21
                    Defendants.
22
23
24      I, Mark Rudzinski, do hereby declare and state under penalty of perjury

25  pursuant to 28 U.S.C. Section 1746:

26

27

28                              -1-
SF/2307133v1
    FEDEX OFFICE AND PRINT SERVICES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
                                    CERTIFICATION

CH/382664v1

1. I have personal knowledge of the matters set forth herein, and if called upon to testify regarding the contents of this declaration, could and would testify competently about them.

2. I am the managing director of Aeffect, Inc., a communications and consumer research consulting firm located in Deerfield, Illinois. I hold an MBA degree from DePaul University in Chicago, and have received extensive postgraduate training in marketing research. I have attached hereto as Exhibit A a true and correct copy of my *Curriculum Vitae*. At Aeffect, I am routinely engaged in assessing consumer behavior and the effect of messaging to consumers. Our largest clients include the U.S. Department of Health and Human Services, the U.S. Postal Service, and a number of prominent private corporations. I have not previously done any work for FedEx Office, FedEx Corp., or Sedgwick LLP.

3. On or about November 28, 2011, I was contacted by Anthony Anscombe, one of the Counsel for FedEx Office, in connection with the lawsuit designated on the caption above. Based on my discussions with Mr. Anscombe and Stephanie Sheridan, I understand that FedEx Office has been sued in a class action lawsuit in Federal Court in California. I have been provided with a copy of the operative complaint. I understand that the Plaintiffs seek to recover on behalf of a class of FedEx Office

FEDEX OFFICE AND PRINT SERVICES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

SF/2307133v1

CH/382664v1

customers statutory penalties in connection with the printing of the first two digits of customer credit card numbers on receipts issued at FedEx Office stores.

4. Mr. Anscombe and Ms. Sheridan informed me that FedEx Office serves a number of business functions, such as print, copy, and computer services, and caters to small business clients and those who work remotely. It was their interest to find out how such customers might feel about this law suit when provided with some basic information about it. They were also interested in how many consumers might still have receipts for transactions conducted between April 2009 and April 2010. Lastly, they were interested in learning something about public perceptions about risks associated with identity theft, and whether consumers were concerned that an action of this variety might cause the costs of goods and services to increase.

5. It is my understanding that FedEx Office does not have contact information for persons who actually visited its stores in 2009 and 2010. In order to provide some general information on these topics, I prepared an on-line survey to be completed by two cohorts of respondents: a larger cohort (200) of persons who identify themselves as consumers, and a smaller cohort of persons (150) who identified themselves as small

-3-

SF/2307133v1

CH/382664v1

business owners.  The selection of these cohorts was intended to test whether one or both groups of consumers might have different attitudes toward this lawsuit.

6.  The questionnaire took about five minutes for respondents to complete.  I have attached a copy of the questionnaire as Exhibit B.

7.  I attach hereto as Exhibit C a true and correct copy of the report of findings made by Aeffect.  Most respondents had, within the last year, used stores providing the types of services offered by FedEx Office.  The use of personal credit cards was the most frequent method of payment, although substantial numbers of respondents had also used business-issued credit cards.

8.  The report sets out our findings.  Most respondents stated that they believed that this action was inappropriate.  Most expected that, in the event of a recovery by the plaintiffs, the costs would be passed on to consumers.  Most also believed that only the lawyers would benefit.  The raw data are retained and can be reviewed to provide information responsive to other issues.

9.  In my opinion, this survey was conducted according to standard protocols for conducting on-line surveys.  On-line surveys are a tool commonly used by market researchers for estimating and understanding consumer

-4-

SF/2307133v1

CH/382664v1

attitudes. The attached report accurately and truthfully reflects our findings.

I declare under penalty of perjury under the laws of the United States, and the State of Illinois, that the foregoing is true and correct.

Executed on:   *December 11, 2011*

Executed at:   *La Grange, Illinois*

*Mark Ruszkowski*

FEDEX OFFICE AND PRINT SERVICES, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# Exhibit A

**Mark Rudzinski**
*CURRICULUM VITAE*
*Managing Director, Aeffect, Inc. (Project Director)*

**1. Education**
Master of Business Administration, DePaul University
Bachelor of Arts in History, Oberlin College

**2. Postgraduate Training**
AMA School of Marketing Research, University of Notre Dame
Approaches to Market Segmentation, AMA
Advanced Applications of Market Segmentation, AMA
Laddering:  Applications to Communications Strategy, AMA

**3. Summary of Professional Experience**
Mark Rudzinski is a seasoned communications professional, with 20 years' experience in communications research, planning and execution targeting a wide variety of audiences, including seniors, low SES, individuals with specific disease states, physicians, insurance executives and health care administrators. Because of his background, he brings a valuable blend of theory, research and application to his communications consulting assignments. In his role as a senior communications executive, he has launched and repositioned health care brands and has assisted organizations in maximizing the effectiveness of their communications investments. He has leveraged his experience and achievements on the corporate side to aid both governmental and not-for-profit organizations in various social marketing and cause-related programming. He has strong experience in the changing requirements of older adult services, consumer segmentation and social marketing. Mark has conducted hundreds of qualitative interviews and directed many quantitative surveys to inform health communications evaluations.

**4. Professional Experience**
**Aeffect, Inc. (a communications research & strategy firm)** Managing Director, 2001-Present

Select accounts/contracts managed:
*(1)* **Project Director, Health Communications Research Contract #HHHSM-500-2005-00035I, Office of External Affairs, Centers for Medicare and Medicaid Services (CMS), 2003 to present**
Projects involved formative, process and summative research to assist CMS in designing communications strategies and tactics that assist beneficiaries in making informed decisions regarding insurance coverage and preventive health behaviors; selected projects include:
– *Consumer Research on Motivating Adoption of Preventive Screening Behavior, 2007-2009.*
– *Consumer Research on New Enrollee, Coming of Ager and Baby Boomer Retirement Planning Needs, 2008*
– *Beneficiary Research to Guide Low Income Subsidy (LIS) Outreach and Communications Strategy, 2007-2008*
– *Formative Research Regarding Consumer Use of Cost and Efficiency Tools, 2006*
– *Consumer Research on CMS Communications Products, including Medicare & You, Guide to Health Insurance for People with Medicare and numerous notices, letters, brochures and photonovellas, 2003-2011*

*(2)* **Project Director, Formative Research to Guide Outreach Initiatives to Promote Utilization of Preventive Benefits and Evaluate Program Efficiency, Community Health Network, Indianapolis, Indiana, 2007-2008**
Project involved formative qualitative and quantitative research to identify community health risks and develop a multi-lateral response to identified needs through 1) partnerships with community organizations and 2) development of employer-based products. Recommendations included identification of high priority community health needs; appeal of various potential community partners from a user standpoint; and a methodology using PRECEDE-PROCEED model for implementing community partnership development.

*(3)* **Project Director, Formative Consumer Research to Guide Clinical Development of New Care Models, Fairview Health Services, Minneapolis, Minnesota, 2009-2011.**
Series of qualitative and quantitative projects to guide vertically integrated delivery network in developing new care models in support of implementation of an accountable care organization.  Qualitative research focused on gauging reaction to new models of chronic disease care, barriers to adoption of alternatives to traditional physician encounters (use of mid level providers, video and online encounters) appeal of different fee-for-service care bundles

and identification of the optimal care experience in this emerging environment.  Quantitative research focused on conjoint analysis of potential health plan product features resulting from the care model.

*(4)* **Project Director, Formative Research to Guide Development of a Consumer Health Care Decision Making Model, Community Health Network, Indianapolis Indiana, 2003-2005, 2011**
Project involved formative qualitative and quantitative research to: review literature on health care decision making theory; explore the values, information sources and processes used to make decisions; and quantify various attitudes, behaviors and geo-demographics. The result of this research was a consumer segmentation model that the client uses to plan communications activities across a diverse range of consumer points of contact. In addition, Aeffect led a series of internal symposia, using a custom-designed curriculum and educational materials, to educate communicators in planning, executing and evaluating consumer communications activities.

*(5)* **Project Director, Formative Research to Drive Brand Communication Messaging, NorthShore University Health System, 2010 to present**
Project involved formative qualitative and quantitative research to enable development of messaging to support brand and service line growth..  Target audience included high schema neurology and oncology patients, as well as consumers whose medical care needs are more primary in nature. Recommendations included messaging strategy to target different consumer segments to engage them in specific offerings of the health system.

*(6)* **Task Order Leader, Health Communication Evaluation, 2001 to present, Centers for Disease Control:**
*-Office of the Director/Office of Communications          -National Center for Chronic Disease Prevention & Health Promotion*
*-National Center for HIV, STD and TB Prevention          -National Center for Injury Prevention & Control*
Projects involved formative, process and outcome evaluation of health communication initiatives and social marketing programs designed to enable the U.S. government to achieve Healthy People 2010 objectives including:
–   *Formative Research to Reduce the Burden of Arthritis on Lower SES People with Arthritis*
–   *Formative Research to Develop Communications for Spanish-Speaking Individuals with Traumatic Brain Injury*
–   *Development of HIV Testing Campaign, 2003-2004, National Center for HIV, STD, and TB Prevention*

**Advocate Health Care, Chicago, IL (Top 5 integrated health care delivery system US) 1994-2001**
**Director, Market Research and Director, Business Development**
Launched marketing research function at one of the most highly rated health care systems in the United States. Directed formative and summative research to guide and evaluate communications activities targeting a wide array of audiences, including seniors, low income SES and individuals facing different disease states. Directed business development activities for two 650-bed hospitals and a 250-physician medical group.

**Rush Prudential Health Plans, Chicago, IL 1991-1994**
**Manager, Market Research**
Launched research and business analysis function at one of the Chicago area's largest managed health care organizations, comprising staff model, IPA, PPO, POS and Medicare managed care products. Conducted health plan research with benefits managers, brokers, third party administrators, seniors, HMO enrollees and consumers.

**5. Memberships & Associations:**
- American Public Health Association
- Society for Healthcare Strategy and Market Development
- Forum for Healthcare Strategists
- American Marketing Association

**6. Presentations, Training/Lectures and Awards:**
- "Using Values-Based Health Communications to Promote Preventive Care Utilization Among Seniors," American Public Health Association Annual Meeting, San Diego, California, 2008
- "Consumer Decision Making: Motivators of and Barriers to Colon Cancer Screening Among the Medicare Population," American Public Health Association Annual Meeting, Washington, DC, 2007
- "Transparency and Price Sensitivity:  Impact on Your Bottom Line," Twelfth National Forum on Consumer-Based Marketing Strategies, Orlando, Florida, 2007
- "Social Marketing Foundations and Principles,"  Metropolitan Chicago Health Care Council Summit, 2002
- "Formative Research to Guide Social Marketing to Corporations," 2003 Chicago/Cook County Diabetes Initiative Congress, Chicago, Illinois, 2003

# Exhibit B

**PUBLIC OPINION SURVEY—CREDIT CARD CLASS ACTION CERTIFICATION TESTING INTERNET SURVEY**

**December 5, 2011 (Draft 2)**

---

**INTRODUCTION**

---

We are conducting a brief public opinion survey about copying and shipping services and would like to obtain your opinion.  Your input is very important. We will not sell you anything and the information we collect will only be used for research purposes. This survey should only take a few minutes. Thank you very much for your time.

---

**SECTION 1: SCREENING AND PROFILING QUESTIONS**

---

**S1.    INDUSTRY SCREEN**

Do you or does anyone in your immediate household work for . . . [ACCEPT MULTIPLES]

| | | |
|---|---|---|
| A hospital | 1 | [CONTINUE] |
| A credit card company | 2 | [TERMINATE] |
| A company that provides copying and shipping services | 3 | [TERMINATE] |
| A law firm | 4 | [TERMINATE] |
| A construction company | 5 | [CONTINUE] |
| A market research company | 6 | [TERMINATE] |
| None of the above | 7 | [CONTINUE] |

**S2.    STATE**

What state do you live in?

_____

**S3.    GENDER**

What is your gender?

| | |
|---|---|
| Male | 1 |
| Female | 2 |

**S4.     AGE**

Which of the following categories includes your age?

| | | |
|---|---|---|
| Under 25 years old ........................... | 1 | [TERMINATE] |
| 25-34 ................................................. | 2 | |
| 35-44 ................................................. | 3 | |
| 45-54 ................................................. | 4 | **[CONTINUE]** |
| 55-64 ................................................. | 5 | |
| 65-74 ................................................. | 6 | |
| 75 or older ...................................... | 7 | [TERMINATE] |

**S5:  SMALL BUSINESS OWNER STATUS**

Are you a partner in or owner of a small business?

| | | |
|---|---|---|
| Yes | 1 | RECRUIT n=150. [ASK S5AA AND THEN SKIP TO S6.] |
| No | 2 | RECRUIT n=200 [SKIP TO S5A] |

**S5AA: NUMBER OF EMPLOYEES**

Approximately, how many employees does your company have?   [PROGRAMMER: TERMINATE IF OVER 100 EMPLOYEES] _____

**S5A:  EMPLOYMENT STATUS**

Are you currently employed?

| | | |
|---|---|---|
| Yes | 1 | |
| No | 2 | SKIP TO S7 |

**S6: WORKSITE LOCATION**

Which of the following best describes the extent to which you perform your job responsibilities at home? [SINGLE RESPONSE]

| | |
|---|---|
| I primarily work out of my home | 1 |
| I never work out of my home | 2 |
| I work out of my home at least some of the time | 3 |

**S7.      CATEGORY USE**

During the past 12 months have you visited a retail store that sells shipping, printing/copying and other office support services?  Just to be clear, these are stores where you can drop off a package to be packed and shipped, where you can make photocopies, where you can print documents or posters and purchase office supplies and materials related to these activities.

Yes                                          1

No                                           2      [SKIP TO
                                                    SECTION 2]


**S8. FREQUENCY OF USE**

Approximately how many times have you used this type of store during the past 12 months?

_____


**S9.      REASON FOR USE**

Thinking about the last several times you used this store, which of the following best describes the primary reason for using it? [SINGLE RESPONSE]

Primarily for business reasons          1

Primarily for personal reasons          2

For both business and personal          3
reasons


**S10.      METHOD OF PAYMENT**

When you have used this store, which of the following is the main way in which you have paid for the services you purchased? [SINGLE RESPONSE]

Personal credit card                    1

Company credit card                     2

Cash                                    3


| SECTION 2: REACTION TO CLASS ACTION LAWSUIT |
| --- |

Two customers of a chain retail store are seeking to pursue a class action lawsuit against a chain of retail stores that provides copying/printing and office support services because the receipt generated as a result of the transaction contained the first two digits and last four digits of the customer's credit card number.  The middle 10 digits were not displayed and represented as an "X," such as "14xx-xxxx-xxxx-9999.  Their attorneys claim that this exposed the stores' customers to risk of identity theft and violated a federal statute.  The lawyers believe that the

stores were at fault for printing the extra two digits.  The stores claim that they did not intend for the extra digits to appear on the receipts.  The stores no longer print the first two digits of the credit card numbers.

There is no evidence that anyone's identity was compromised as a result of these receipts. Further, the first two and last four digits do not disclose any identifying information about the cardholder. The attorneys are likely seeking damages from the stores in an amount  exceeding $300 million dollars..

The three most likely outcomes for this action are:
1)  The Plaintiffs will win what they are after;
2)  The Plaintiffs will lose; or
3)  The two sides will settle for less than the Plaintiffs are seeking.

## Q3:  IMPACT OF LAWSUIT

Based on this description of the situation, please rate your level of agreement with the following statements:  [ROTATE ORDER OF EXPOSURE]

|  | Strongly disagree | Somewhat disagree | Not sure | Somewhat agree | Strongly agree |
|---|---|---|---|---|---|
| A.  As a result of this lawsuit, my identity will be more secure should I use this company's services in the future. | 1 | 2 | 3 | 4 | 5 |
| B.  If the company is ordered to pay these damages, the cost will be passed on to customers in the form of higher prices. | 1 | 2 | 3 | 4 | 5 |
| C.  The only people who are going to benefit from this lawsuit will be the lawyers who are collecting fees based on any money damages awarded. | 1 | 2 | 3 | 4 | 5 |

## Q4.     ATTITUDE TOWARD LAWSUIT

 If you were one of the customers of this retail store and had received one of the receipts, which of the following would best describe how you feel about this lawsuit?

I think it is appropriate to take legal action against this company.          1

I think this legal action is  inappropriate.          2

**Q5.        ABILITY TO LOCATE CREDIT CARD RECEIPTS**

If you were one of the customers of this store and had received a credit card receipt between April 2009 and April 2010 for a copy or print service, do you think you could still find a copy of it?

Yes                             1
No                              2

| SECTION 3: PERCEPTIONS OF SAFETY AND SECURITY CONCERNS |
|---|

**Q6.        THREATS AND RISKS THAT POSE CONCERN**

Please rate the level of concern that you have for you and your family's safety and security regarding the following issues. [ROTATE]

|  | Not at all concerned | Not too concerned | Not sure | Somewhat concerned | Very concerned |
|---|---|---|---|---|---|
| A.  Terrorism | 1 | 2 | 3 | 4 | 5 |
| B.  Medical error by a doctor or hospital | 1 | 2 | 3 | 4 | 5 |
| C.  Theft of your identity or personal information | 1 | 2 | 3 | 4 | 5 |
| D.  Personal crime such as robbery or assault | 1 | 2 | 3 | 4 | 5 |
| E.  State of the economy and your job security | 1 | 2 | 3 | 4 | 5 |
| F.  Traffic accident going to/from work or school | 1 | 2 | 3 | 4 | 5 |

**Q7.**    **IDENTITY CONCERNS**

Thinking about risks to your personal safety and security from identity theft, which of the following situations are you most concerned about?  Please identify the top two areas of concern? [ALLOW 2 RESPONSES]

| | |
|---|---|
| Theft of your wallet or purse | 1 |
| Telemarketing scams designed to get you to disclose personal information | 2 |
| Internet scams designed to get you to disclose personal information | 3 |
| Finding personal information in my trash | 4 |
| Theft of my mail | 5 |
| Interception of information transmitted over a wireless network | 6 |
| Theft of credit card information when I'm making a purchase in a store | 7 |

# Exhibit C



520 LAKE COOK ROAD
SUITE 200
DEERFIELD ILLINOIS 60015
TEL 847 267 0169
FAX 847 267 0172

**Memorandum**

TO:     Anthony Anscombe
            Stephanie Sheridan
            Sedgwick LLC

FROM:  Mark Rudzinski

DATE:  December 12, 2011

RE:      FINDINGS OF PUBLIC OPINION SURVEY ON CREDIT CARD CLASS ACTION SUIT

The purpose of this memo is to provide a summary of findings of the online survey that Aeffect conducted with general consumers and small business owners regarding attitudes toward litigation emanating from the printing of selected credit card digits on retail receipts. Specifically, the receipts were provided to FedEx Store customers who used self-service kiosks and requested a receipt after completing their transaction. The purpose of the research is to assess the attitudes of consumers and small business owners toward the litigation and whether or not the litigation should proceed.

**<u>Summary</u>**

**A. Key Research Findings**

- **<u>Support for the action against the retailer is limited.</u>** A substantial majority (74%) do not feel the action is appropriate after reviewing a description of the situation upon which the action is based. Of significance, there is no segment of the public that expresses a higher degree of support for the action. Of particular note, members of the public who express greater levels of personal concern about identity theft in retail settings are <u>no more likely</u> to support this action than those who express lower levels of concern.

- **<u>The public sees little potential benefit resulting from this action.</u>** They strongly agree that prices will go up if damages are awarded (79%) and that the only beneficiaries from this action will be the attorneys (77%). Even on the question of greater future identity security when shopping at this store, consumers are uncertain about the benefits, with only 32% saying that they will likely be more secure if this action is taken.

- **<u>General consumers are unlikely to be able to produce supporting documentation related to this action.</u>** While business owners are more apt indicate that the will be able to produce a receipt from the time period in question (58%), only 28% of general consumers indicate that they would have this type of documentation in their records.

Summary Report of Public Opinion Findings
December 12, 2011
Page 2

## B. Methodology

Aeffect conducted an online survey with a sample of n=200 consumers age 25-74 and with n=150 small business owners (defined as firms with fewer than 50 employees). Respondents were accessed via nationally-representative research panels and were solicited to participate via email. Consistent with customer profile information collected by FedEx Stores, the survey sought to identify individuals who use these retail destinations for a mix of personal and business needs. Respondents were incentivized to participate subject to the terms of their participation in the panel. No specific incentive was provided directly by Aeffect to gain cooperation.

The survey averaged 5 minutes in length and had an overall study incidence of 66%. Respondents were asked the following sequence of topics:

- Demographic questions (age, gender).
- Questions related to employment, use of office support retail destinations, reasons for use and mode of payment.
- Review of a description of the situation regarding the litigation and the potential amount of award to be pursued, followed by a series of attitudinal questions about the suit and whether or not, in their opinion, it should proceed.
- Assessment of threat from a variety of safety/security risks, as well as from specific factors related to identity theft.

Respondents were exposed to questions assessing their reaction to the litigation immediately after providing basic, descriptive information about their shopping patterns in order to minimize any risk of bias due to exposure to other lines of questioning related to safety/security risks or identity theft.

## C. Summary of Detailed Findings

**Respondent profile.** Demographically, respondents skew female and represent a mix of ages.

**Table 1: Respondent Demographics**

| | Total Sample | Type of Consumer | | Retail ID Theft Concern | | Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Small Bus. | Con-sumer | Higher | Lower | M | F |
| **Gender** | % | % | % | % | % | % | % |
| Male | 36 | 39 | 34 | 37 | 34 | 100 | -- |
| Female | 64 | 61 | 66 | 63 | 66 | -- | 100 |
| | | | | | | | |
| **Age** | | | | | | | |
| 25-44 | 34 | 26 * | 38 | 30 | 37 | 22 * | 39 |
| 45-54 | 30 | 30 | 30 | 28 | 33 | 33 | 28 |
| 55+ | 38 | 45 * | 32 | 42 * | 31 | 45 * | 33 |
| Base size | 360 | 155 | 205 | 207 | 153 | 129 | 231 |

S3. Gender, S4. Age.
*represents a statistically significant difference between adjacent columns at the 95% confidence level

Summary Report of Public Opinion Findings
December 12, 2011
Page 3

**Worklife profile.** As shown in Table 2 below, the majority of respondents are general consumers (57%) and three out of four are employed (76%). Note that 10% are past the age of retirement. Two out of three (68%) work at home at least part of the time.

Table 2: Work/Life Demographics

|  | Total Sample | Type of Consumer | | Retail ID Theft Concern | | Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  |  | Small Bus. | Con-sumer | Higher | Lower | M | F |
| **Small bus. partner/owner** | % | % | % | % | % | % | % |
| Yes | 43 | 100 | -- | 48 * | 36 | 47 | 41 |
| No | 57 | -- | 100 | 52 * | 64 | 53 | 59 |
| Base | 360 | 155 | 205 | 207 | 153 | 129 | 231 |
| **Currently employed** |  |  |  |  |  |  |  |
| Yes | 76 | -- | 76 | 74 | 78 | 68 | 79 |
| No | 24 | -- | 24 | 26 | 22 | 32 | 21 |
| Base (not partner/owner) | 205 | -- | 205 | 107 | 98 | 69 | 136 |
| **Extent work at home** |  |  |  |  |  |  |  |
| Primarily | 45 | 59 * | 32 | 44 | 47 | 37 * | 49 |
| Never | 32 | 15 * | 48 | 31 | 32 | 36 | 29 |
| Sometimes | 23 | 26 | 20 | 25 | 21 | 26 | 22 |
| Base size | 310 | 155 | 155 | 179 | 131 | 107 | 203 |

S5. Are you a partner in or owner of a small business? S5A. Are you currently employed? S6. Which of the following describes the extent to which you perform your job responsibilities at home?
Note: Some percentages should be interpreted with caution due to small base sizes.
*represents a statistically significant difference between adjacent columns at the 95% confidence level

**Retail office support shopping history.** As show in Table 3 below, the majority of respondents (60%) report having visited a retail destination that provides office support services. Small business owners are more apt to use these stores than consumers and tend to use them more frequently. The principal mode of payment when shopping these stores is a personal credit card (53%)—even among small business owners (48%).

Summary Report of Public Opinion Findings
December 12, 2011
Page 4

**Table 3: Behavior Related to Retail Office Support Destinations**

| | Total Sample | Type of Consumer | | Retail ID Theft Concern | | Gender | |
|---|---|---|---|---|---|---|---|
| | | Small Bus. | Con-sumer | Higher | Lower | M | F |
| **Visited retail office support store in past 12 mo.** | % | % | % | % | % | % | % |
| Yes | 60 | 72 * | 51 | 60 | 60 | 59 | 61 |
| No | 40 | 28 * | 49 | 40 | 40 | 41 | 39 |
| Base (total sample) | 360 | 155 | 205 | 207 | 153 | 129 | 231 |
| **Mean number of visits** | *8.03* | *9.66* | *6.30* | *8.54* | *7.35* | *7.64* | *8.24* |
| **Primary reason for use** | | | | | | | |
| Business reasons | 37 | 54 * | 19 | 45 * | 26 | 46 * | 32 |
| Personal reasons | 29 | 12 * | 48 | 26 | 33 | 25 | 31 |
| Both business and personal | 34 | 35 | 33 | 29 | 41 | 29 | 37 |
| **Main payment method** | | | | | | | |
| Personal credit card | 53 | 48 | 59 | 52 | 55 | 55 | 52 |
| Company credit card | 27 | 35 * | 19 | 33 * | 20 | 28 | 27 |
| Cash | 19 | 17 | 22 | 15 | 25 | 17 | 21 |
| Base size (visited store) | 217 | 112 | 105 | 125 | 92 | 76 | 141 |

S7. During the past 12 months, have you visited a retail store that sells shipping, printing/copying and other office support services? S8. Approximately how many times have you used this type of store during the past 12 months? S9. Thinking about the last several times you used this store, which of the following best describes the primary reason for using it? S10. When you have used this store, which of the following is the main way in which you have paid for the services you purchased?
Note: Some percentages should be interpreted with caution due to small base sizes.
*represents a statistically significant difference between adjacent columns at the 95% confidence level

**Concern about various safety/security issues.** To gauge the extent to which identity theft is an area of concern for respondents, they were asked to rate their level of concern about a variety of safety/security concerns. The economy and job security (82%) is mentioned most frequently, followed by identity theft (76%).

**Table 4: Concern About Various Safety/Security Issues**

| (Top 2 Box) | Total Sample | Type of Consumer | | Retail ID Theft Concern | | Gender | |
|---|---|---|---|---|---|---|---|
| | | Small Bus. | Con-sumer | Higher | Lower | M | F |
| **Concerned about…** | % | % | % | % | % | % | % |
| Terrorism | 58 | 53 | 62 | 61 | 55 | 52 * | 62 |
| Medical errors | 67 | 65 | 57 | 69 | 63 | 59 * | 70 |
| Personal identity theft | 76 | 76 | 76 | 83 * | 67 | 69 * | 80 |
| Personal crime (robbery/assault) | 63 | 63 | 63 | 64 | 61 | 54 * | 68 |
| Economy and job security | 82 | 83 | 82 | 86 * | 77 | 77 * | 86 |
| Traffic accidents | 57 | 53 | 60 | 58 | 56 | 49 * | 61 |
| Base size | 360 | 155 | 205 | 207 | 153 | 129 | 231 |

Q6A-F. Please rate the level of concern that you have for you and your family's safety and security regarding the following issues.... [5-pt. scale from 1="Not at all concerned" to 5="Very concerned].
Note: Top 2 Box=percentage of respondents who report "Somewhat" or "Very concerned"
*represents a statistically significant difference between adjacent columns at the 95% confidence level

Summary Report of Public Opinion Findings
December 12, 2011
Page 5

**Concern about specific modes of identity theft.**  Respondents were then exposed to a description of a variety of threats that could lead to the theft of their identity and/or credit card number.  They were asked to identity the top two threats from among the list.  Table 5 below nets the total mentions (first and second) for each item.

Theft of credit card information at a retail destination (58%) is mentioned most frequently as an area of concern.  Small business owners (64%) are more likely to mention this threat than consumers (52%).

**Table 5: Concern About Specific Modes of Identity Theft**

| Ranked 1st or 2nd | Total Sample | Type of Consumer | | Retail ID Theft Concern | | | Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Small Bus. | Con-sumer | Higher | | Lower | M | F |
| | % | % | % | % | | % | % | % |
| Theft of CC info. during in-store purchase | 58 | 64 | * 52 | 100 | | -- | 60 | 57 |
| Theft of wallet or purse | 46 | 43 | 49 | 42 | * | 53 | 47 | 46 |
| Theft of info. from wireless network | 41 | 41 | 42 | 36 | * | 48 | 35 | 44 |
| Internet scams to get personal info. | 22 | 19 | 23 | 8 | * | 39 | 22 | 22 |
| Mail theft | 18 | 18 | 19 | 8 | * | 32 | 19 | 18 |
| Theft of personal info. from trash | 8 | 9 | 8 | 5 | * | 14 | 8 | 8 |
| Telemarketing scams to get personal info. | 7 | 5 | 8 | 2 | * | 14 | 11 | 5 |
| Base size | 360 | 155 | 205 | 207 | | 153 | 129 | 231 |

Q7. Thinking about risks to your personal safety and security from identity theft, which of the following situations are you most concerned about?
*represents a statistically significant difference between adjacent columns at the 95% confidence level

**Reaction to lawsuit.**  Respondents were exposed to the following description of the situation related to this legal action:

*Two customers of a chain retail store are seeking to pursue a class action lawsuit against a chain of retail stores that provides copying/printing and office support services because the receipt generated as a result of the transaction contained the first two digits and last four digits of the customer's credit card number.  The middle 10 digits were not displayed and represented as an "X," such as "14xx-xxxx-xxxx-9999.  Their attorneys claim that this exposed the stores' customers to risk of identity theft and violated a federal statute.  The lawyers believe that the stores were at fault for printing the extra two digits.  The stores claim that they did not intend for the extra digits to appear on the receipts.  The stores no longer print the first two digits of the credit card numbers.*

*There is no evidence that anyone's identity was compromised as a result of these receipts. Further, the first two and last four digits do not disclose any identifying information about the cardholder. The attorneys are likely seeking damages from the stores in an amount exceeding $300 million dollars.*

*The three most likely outcomes for this action are:*
*1) The Plaintiffs will win what they are after;*
*2) The Plaintiffs will lose; or*
*3) The two sides will settle for less than the Plaintiffs are seeking.*

Summary Report of Public Opinion Findings
December 12, 2011
Page 6

After reviewing the description, respondents were asked to rate their level of agreement with three attitudinal questions regarding legal action in this matter.  The statements are presented in Table 6 below.  The vast majority of respondents (79%) agree that the costs of any damage award will be passed on to customers in the form of higher prices.  Similarly, there is widespread agreement that the only beneficiaries of this action would be the lawyers involved (77%).

Respondents are more mixed when it comes to the issue of their identity being more secure—as a result of this action—if they use this store's services in the future.  Only 32% agree that they feel they would be more secure in future use.  A relatively equal number (36%) do not feel that this action would have an impact on their future identity security during store use, while 33% are just not sure what impact the action will have.  There is no statistically significant variance in these results between consumers who express a higher degree of concern about credit card number/identity theft when shopping and those who express less concern.

**Table 6: Reaction to Lawsuit (Top 2 Box)**

| (Top 2 Box) | Total Sample | Type of Consumer | | Retail ID Theft Concern | | Gender | |
|---|---|---|---|---|---|---|---|
| | | Small Bus. | Con-sumer | Higher | Lower | M | F |
| **Agree that…** | % | % | % | % | % | % | % |
| My identity will be more secure if I use this company's services in the future | 32 | 26 * | 36 | 35 | 28 | 29 | 33 |
| The cost of damages will be passed on to customers as higher prices | 79 | 78 | 80 | 82 | 75 | 85 * | 76 |
| Only lawyers will benefit from this lawsuit from damages awarded | 77 | 81 | 74 | 78 | 75 | 76 | 77 |
| Base size | 360 | 155 | 205 | 207 | 153 | 129 | 231 |

Q3A-C. A: As a result of this lawsuit, my identity will be more secure should I use this company's services in the future. B: If the company is ordered to pay these damages, the cost will be passed on to customers in the form of higher prices. C:The only people who are going to benefit from this lawsuit will be the lawyers who are collecting fees based on any money damages awarded. [5-pt. scale from 1="Strongly disagree" to 5="Strongly agree].
Note: Top 2 Box=percentage of respondents who report "Somewhat" or "Strongly agree"
*represents a statistically significant difference between adjacent columns at the 95% confidence level

When reviewing the data by those who have shopped at this type of retail destination and those who have not, there are no differences in the attitudes of shoppers and non-shoppers toward the action.

**Table 6a: Reaction to Lawsuit by Shopper Status(Top 2 Box)**

| (Top 2 Box) | Total Sample | Shopper Status Yes | No |
|---|---|---|---|
| **Agree that…** | % | % | % |
| My identity will be more secure if I use this company's services in the future | 32 | 32 | 31 |
| The cost of damages will be passed on to customers as higher prices | 79 | 78 | 80 |
| Only lawyers will benefit from this lawsuit from damages awarded | 77 | 77 | 77 |
| Base size | 360 | 155 | 205 |

Q3A-C. A: As a result of this lawsuit, my identity will be more secure should I use this company's services in the future. B: If the company is ordered to pay these damages, the cost will be passed on to customers in the form of higher prices. C:The only people who are going to benefit from this lawsuit will be the lawyers who are collecting fees based on any money damages awarded. [5-pt. scale from 1="Strongly disagree" to 5="Strongly agree].
Note: Top 2 Box=percentage of respondents who report "Somewhat" or "Strongly agree"
*represents a statistically significant difference between adjacent columns at the 95% confidence level

**Attitude toward pursing lawsuit.** Following the battery of attitudinal questions, respondents were asked to indicate whether or not they support this action.  By a margin of three to one, respondents believe this action is inappropriate (74%).  There is no variance between small business owners and consumers (76% versus 73%) on the matter, nor is there any difference between segments of respondents based on their level of concern toward theft of their credit card information/identity in retail settings.

**Table 7: Attitude Toward Pursuing Lawsuit**

| | Total Sample | Type of Consumer Small Bus. | Con-sumer | Retail ID Theft Concern Higher | Lower | Gender M | F |
|---|---|---|---|---|---|---|---|
| **If an affected customer…** | % | % | % | % | % | % | % |
| I think it is appropriate to take legal action against this company | 26 | 24 | 27 | 25 | 27 | 24 | 26 |
| I think this legal action is inappropriate | 74 | 76 | 73 | 75 | 73 | 76 | 74 |
| Base size | 360 | 155 | 205 | 207 | 153 | 129 | 231 |

Q4. If you were one of the customers of this retail store and had received one of the receipts, which of the following would best describe how you feel about this lawsuit?
*represents a statistically significant difference between adjacent columns at the 95% confidence level

Summary Report of Public Opinion Findings
December 12, 2011
Page 8

Similarly, there is no difference in attitudes toward pursuing the action among shoppers and non-shoppers.

**Table 7a: Attitude Toward Pursuing Lawsuit**

| | Total Sample | Shopper Status | |
|---|---|---|---|
| | | Yes | No |
| **If an affected customer…** | % | % | % |
| I think it is appropriate to take legal action against this company | 26 | 24 | 27 |
| I think this legal action is inappropriate | 74 | 76 | 73 |
| Base size | 360 | 155 | 205 |

Q4. If you were one of the customers of this retail store and had received one of the receipts, which of the following would best describe how you feel about this lawsuit?
*represents a statistically significant difference between adjacent columns at the 95% confidence level

**Ability to produce credit card receipt.** Nearly two-thirds of respondents (61%) indicate that they would not be able to produce a credit card receipt from the time period in question.  Not surprisingly, small business owners (55%) are far more likely to indicate they are able to produce this documentation in comparison to general consumers (28%).

**Table 8: Ability to Produce Credit Card Receipt**

| | Total Sample | Type of Consumer | | | Retail ID Theft Concern | | | Gender | |
|---|---|---|---|---|---|---|---|---|---|
| | | Small Bus. | | Con-sumer | Higher | | Lower | M | F |
| **Able to find copy of receipt?** | % | % | | % | % | | % | % | % |
| Yes | 39 | 55 | * | 28 | 44 | * | 33 | 43 | 37 |
| No | 61 | 45 | * | 72 | 56 | * | 67 | 57 | 63 |
| Base size | 360 | 155 | | 205 | 207 | | 153 | 129 | 231 |

Q5. If you were one of the customers of this store and had received a credit card receipt between April 2009 and April 2010 for a copy or print service, do you think you could still find a copy of it?
*represents a statistically significant difference between adjacent columns at the 95% confidence level

**RAZMIG TCHOGOIAN v. FEDEX OFFICE AND PRINT SERVICES, INC.**
U.S. District Court, Central District of California, Case No. 8:10-cv-01008-AG-MLG

### PROOF OF SERVICE

    I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Sedgwick LLP, 333 Bush Street, 30th Floor, San Francisco, California 94104-2834. On December 12, 2011, I served the within document(s):

### DECLARATION OF MARK RUDZINSKI

☐     FACSIMILE - by transmitting via facsimile the document(s) listed above to the fax number(s) set forth on the attached Telecommunications Cover Page(s) on this date before 5:00 p.m.

☒     ELECTRONIC TRANSMISSION– by electronically transmitting the document(s) listed above to the electronic notification address(es) of the addressee(s) listed below.

☐     MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

☐     PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐     OVERNIGHT COURIER - by placing the document(s) listed above in a sealed envelope with shipping prepaid, and depositing in a collection box for next day delivery to the person(s) at the address(es) set forth below via.

Chant Yedalian, Esq.
**CHANT & COMPANY**
A Professional Law Corporation
10866 Wilshire Boulevard
Suite 400
Los Angeles, CA 90024
Telephone: 424.901.8377
Facsimile: 424.744.4177

Attorneys For Plaintiffs
RAZMIG TCHOBOIAN AND
ANGELA POTIKYAN

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served,

1.

SF/2198337v1

Sedgwick

service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.   Executed on December 12, 2011, at San Francisco, California.

LAURA A. FLOOD

PROOF OF SERVICE

SF/2198337v1